# In the District Court of the United States
## For the District of South Carolina
### BEAUFORT DIVISION

| | | |
|---|---|---|
| Carlton Shaw, | ) | Civil Action No. 9:05-3253-SB-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Beaufort County Sheriff's Office, | ) | **OF THE MAGISTRATE JUDGE** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

The Plaintiff, Carlton Shaw ("Plaintiff" or "Shaw"), an African-American male, filed this action against his former employer, the Beaufort County Sheriff's Office (the "Defendant" or the "BCSO"), alleging causes of action against the Defendant for racial harassment, race discrimination (disparate treatment), and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and wrongful termination in violation of S.C. Code Ann. § 41-1-80.  Plaintiff requests a jury trial, and seeks the award of actual, consequential, and compensatory damages, and all damages and equitable remedies made available by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and S.C. Code § 41-10-80, attorneys' fees, and costs of the action.  [1]

This Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Venue is proper because the events at issue occurred in this District and Division.  28 U.S.C. § 1391.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Rule 73.02(B)(2)(g), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under 42 U.S.C. § 2000e, *et seq*., and submit findings and recommendations to the District Court.

## II.    PROCEDURAL HISTORY

On November 21, 2005, Plaintiff filed this action in the United States District Court for the District of South Carolina.  [1]  Before an answer was filed, the Plaintiff filed an Amended Complaint on March 8, 2006.  The Defendant filed its answer on April 17, 2006, setting forth a general denial as to the claims set forth, and also alleging that the Plaintiff failed to properly serve the Summons and Complaint on Defendant.  [6]  Thereafter, the Defendant filed an Amended Answer, again alleging that Plaintiff failed to properly serve the Summons and Complaint on Defendant and also alleging various affirmative defenses such as the statute of limitations, and that Plaintiff had failed to exhaust his available administrative remedies with the United States Equal Employment Opportunity Commission (the "EEOC") and the South Carolina Human Affairs Commission.  [11]

On December 13, 2006, the Defendant filed its Motion for Summary Judgment. [22] Plaintiff filed his response in opposition to the motion for summary judgment on January 16, 2007 [26], and the Defendant filed its reply on January 25, 2007 [28-2].  Plaintiff then filed an Affidavit in opposition to the Defendant's Motion for summary judgment.  [34]  As the issues have been joined, this matter is ripe for review.

### III.    FACTS

### A.  Stipulated Facts

The Plaintiff and the Defendant have stipulated to the following facts, as set forth in their Joint Factual Brief, filed at the Order of the Court:

The Beaufort County Sheriff appointed Carlton Shaw a Deputy on February 3, 2003. The Plaintiff is an African American male.  Policies and procedures, including the Affirmative Action Plan, are established in the BCSO Standard Operating Procedures.  The Standard Operating Procedures, including the internal complaint procedures, are made known to all deputies during training procedures.  The Plaintiff received a copy of the BCSO Standard Operating Procedures.  The Plaintiff reviewed and familiarized himself with all BCSO policies and procedures and at all times had access to the written policies and procedures.

The Plaintiff went to the South Carolina Police Academy on February 23, 2003.  Upon his return from a successful completion of training at the Academy, the Sheriff assigned the Plaintiff to seven days of field training under the supervision of Corporal Hall.  At the end of this training, Cpl. Hall issued a report citing the Plaintiff on several weak areas.  BCSO Major Darrell Butler reviewed this report and recommended an additional seven days of field training under a different officer.

The Plaintiff then began training under BCSO Sergeant Tim Slupski on May 14, 2003. At the end of this training, Sergeant Slupski evaluated the Plaintiff's performance as substandard and recommended that he be terminated, retrained or assigned to another unit which did not include patrol.  The Plaintiff reviewed the written evaluation prior to its completion and submission.

Rather than terminating the Plaintiff, BCSO assigned him to the courthouse security detail.  After reassignment to the courthouse, BCSO gave the Plaintiff additional training.  The Plaintiff's duties at the courthouse included scanning patrons at the front entrance, patrolling the courthouse, courtroom security and transporting a mobile file cabinet from the Sheriff's office to the courthouse.

On June 12, 2003, the Plaintiff received a substandard performance evaluation in shotgun training.  From July 2003 to November 2003, the Plaintiff received seven performance evaluations that revealed he still needed improvement in his driving abilities.

On November 15, 2003, BCSO Captain Richard Roper released Plaintiff from training and approved him for duty.

The Defendant's employees on the job called the Plaintiff "Bo" on several occasions.

On March 29, 2004, the Plaintiff stopped at a traffic light while on duty in a county vehicle and was rear-ended by another driver.  Initially the Plaintiff went to Doctor's Care, a temporary treatment office, but during his tenure with BCSO, he did not seek follow-up treatment from his primary physician.  On November 18, 2004, the Plaintiff told one of his supervisors, Sergeant Jacqueline Wade, that he was still having medical problems from the motor vehicle accident.

Also on November 18, 2004, Lieutenant Mark Mattox and Sergeant Wade spoke to the Plaintiff about his medical problems and told him to contact (Mr.) Jan Watts, the Beaufort County Risk Manager.  The Plaintiff never reported back to either Sergeant Wade or Lieutenant Mattox with a status report.  On December 9, 2004, the Plaintiff told Sergeant Wade that he had not gone to the doctor because, "I don't like doctors and I am procrastinating."  Also on

December 9, 2004, Sergeant Wade ordered Shaw to see a doctor immediately.  On December 10, 2004, Sergeant Wade recommended that BCSO terminate the Plaintiff for insubordination. Lieutenant Mattox reviewed the situation and recommended the Plaintiff's termination to his superior, Captain Roper.

On December 13, 2004, Sergeant Wade, Lieutenant Mattox, Major Butler, Lieutenant Colonel David Brown and Chief Deputy Michael Hatfield met with the Plaintiff to discuss potential termination; they gave the Plaintiff an opportunity to review all the recommendations and memos prepared by his superiors as well as ask questions and discuss the reason for his termination.  During the meeting in Chief Deputy Hatfield's office, the Plaintiff denied that his superiors ordered him to seek medical attention and refused to sign and date the disciplinary form.

The EEOC issued a Right to Sue letter on August 31, 2005.

The Plaintiff filed a complaint in the Beaufort Division of the U.S. District Court on November 21, 2005, and an Amended complaint on March 24, 2006.  The Plaintiff sent the Complaint to the Defendant by certified mail.  The Plaintiff did not personally serve the Sheriff or his clerk.

## B.  The Plaintiff's Statement of Facts in Controversy

The Plaintiff has set forth the following Statement of Facts believed to be in controversy, and the undersigned has set forth the Defendant's corresponding responses to those facts.

*Plaintiff's Fact #1 in Controversy:*

Plaintiff retired from the NYPD in 2002, and accompanied his wife to South Carolina. She was stationed in Beaufort as a permanently activated Reserve Naval Officer.  (Shaw

affidavit 7-10).

***Defendant's Response:***

The fact that the Plaintiff left the NYPD in 2002 is not in controversy; however, this fact is irrelevant, as is any reference to his wife or her duty station.

***Plaintiff's Fact #2 in Controversy:***

The Plaintiff successfully completed training at the academy, before being assigned to field training under the supervision of Corporal Hall.

***Defendant's Response:***

These facts are not in controversy; however, for clarification, the Plaintiff was first assigned to Field Training with Officer Rodriguez, then Officer Hall, then Sgt. Slupski, and finally Officer Norberg.

***Plaintiff's Fact #3 in Controversy:***

Based on his experience with the NYPD, Plaintiff qualified to be a corporal. However, this rank was kept in abeyance pending his completion of training under another officer.

***Defendant's Response:***

These facts are in controversy because Plaintiff would not qualify to be a corporal until he successfully passed field training. Plaintiff did not complete his initial training and had difficulty throughout his orientation and field training. His trainers finally cleared him from training and assigned him to the courthouse where he was given the rank and pay of Corporal.

***Plaintiff's Fact #4 in Controversy:***

Hall was Plaintiff's supervisor and trained the Plaintiff for seven (7) shift days.

***Defendant's Response:***

These facts are not in controversy.

**Plaintiff's Fact #5 in Controversy:**

Cpl. Hall told Plaintiff to destroy a valid summons.  (Shaw Affidavit 17)

**Defendant's Response:**

This fact is in controversy and is irrelevant to the lawsuit.  Cpl. Hall could not destroy a summons which is a numbered citation for which the deputy is accountable.  Cpl. Hall ordered destruction of a written notice, a computer generated slip used to notify persons of court dates, roll call, etc.

**Plaintiff's Fact #6 in Controversy:**

Hall ordered Shaw to engage in dangerous pursuits of subjects who had engaged in very minor violations, even going so far as to tell Shaw to drive head on towards a dune buggy. (Shaw Affidavit 18-19).

**Defendant's Response:**

These facts are in controversy and are irrelevant to the lawsuit.  Hall ordered Shaw on one occasion to pursue a fleeing individual driving a stolen ATV.  Hall ordered pursuit, not a head-on collision course.

**Plaintiff's Fact #7 in Controversy:**

Cpl. Hall ordered Plaintiff to throw a bong (drug paraphernalia) into the ocean.  Shaw kept it and attempted to have it tested as evidence against the perpetrator.  His request was denied.  (Shaw Affidavit 22).

**Defendant's Response:**

This fact is in controversy and is irrelevant to the case.

***Plaintiff's Fact #8 in Controversy:***

At the end of this training, Cpl. Hall issued a report citing several weak areas, mainly on those areas where Plaintiff had found Hall decisions to be dangerous, like driving. On the other hand, Cpl. Hall did make several very positive comments about Shaw's abilities. Major Butler reviewed this report and recommended an additional seven (7) days of field training under a different officer.

***Defendant's Response:***

The fact that Cpl. Hall did make positive comments in those areas that he found the Plaintiff merited the comment is not in controversy; however, Hall's evaluation of the Plaintiff revealed weaknesses in the his knowledge of SC statutes and laws, poor report writing, poor radio protocol, no sense of urgency when responding to calls and questionable driving abilities. (See Exhibit 2 to Defendant's Memorandum in Support of Summary Judgment.).

***Plaintiff's Fact #9 in Controversy:***

The Plaintiff then began training under Sgt. Slupski on May 14, 2003. In Slupski's performance evaluation of the Plaintiff on May 14, 2003, Slupski praised the Plaintiff for his relations with the public and the good judgment Plaintiff exhibited on some calls.

***Defendant's Response:***

The fact that Sgt. Slupski attempted to praise Shaw where warranted and tried to give Shaw a clean slate to assist him in a fresh approach to training is not in controversy. (See Exhibit 2 to Defendant's Memorandum in Support of Summary Judgment.).

***Plaintiff's Fact #10 in Controversy:***

During the early part of the training, Sgt. Slupski, while in the vehicle with Shaw, asked

Shaw, do you think I am a racist?  He then went on to warn Shaw that he might hear Slupski tell a race or watermelon joke to his wife on occasion, and that Slupski did not believe that whole slavery thing.  (Shaw Affidavit 63-64).

***Defendant's Response:***

These facts are in controversy.

***Plaintiff's Fact #11 in Controversy:***

Thereafter, Slupski began to refer to Plaintiff as "bo" almost constantly.  (Shaw Affidavit 65).

***Defendant's Response:***

The fact that Sgt. Slupski referred to Plaintiff as "Bo" is not in controversy; however, for clarification, Sgt. Slupski only occasionally referred to the plaintiff using the term "Bo," a non-racist, general term used by many persons in the lowcountry as a friendly greeting."

***Plaintiff's Fact #12 in Controversy:***

On one occasion, when Slupski was angry with Plaintiff and was preparing to have him go off shift, he called Plaintiff "boy."  (Shaw Affidavit 67)  Shaw recognized "boy" when used in anger by a white man against an African American man to be a racist slur.

***Defendant's Response:***

These facts are in controversy.

***Plaintiff's Fact #13 in Controversy:***

Plaintiff observed that Slupski and another Sergeant, Calandra, used the term "bo" towards African American men, exclusively.

***Defendant's Response:***

This fact is in controversy.

**Plaintiff's Fact #14 in Controversy:**

Plaintiff asked other African American officers and supervisors if bo and boy were synonymous.  They told him that they were.  (Shaw Affidavit 69) .

**Defendant's Response:**

This fact is in controversy.

**Plaintiff's Fact #15 in Controversy:**

Specifically, Sgt Harris told Plaintiff that he interpreted bo to be short for boy and a racial slur towards African Americans.  (Affidavit of Harris).

**Defendant's Response:**

Sgt. Harris submitted an affidavit which speaks for itself.

**Plaintiff's Fact #16 in Controversy:**

Calandra, one of Plaintiff training supervisors, who may have believed that Plaintiff was partly of Latino descent, called him Rico Suave after a Latino singer, and asked him if he spoke Spanish.  (Shaw Affidavit 70).

**Defendant's Response:**

These facts are in controversy.

**Plaintiff's Fact #17 in Controversy:**

Calandra also would mimic a voice and accent which he told Shaw was a parody of what he referred to as an uppity black person.  (Shaw Affidavit 71).

**Defendant's Response:**

These facts are in controversy.

***Plaintiff's Fact #18 in Controversy:***

After being assigned to the Courthouse, Plaintiff was given further training while at the courthouse.  From July 2003 to November 2003, the Plaintiff received seven (7) performance evaluations while he was assigned to Court House Security Detail.  The evaluations reveal the Plaintiff performed his courthouse duties well and in a professional manner.

***Defendant's Response:***

The fact that the Plaintiff received 7 evaluations while he was assigned to the courthouse is not in controversy; however, for clarification, not all of the evaluations reflect Plaintiff performed well and professionally.  (See Exhibit 3 to Defendant's Memorandum in Support of Summary Judgment.).

***Plaintiff's Fact #19 in Controversy:***

Sgt. Harris, Plaintiff direct supervisor, evaluated the Plaintiff as performing his duties well while at the Courthouse.  (Harris Affidavit).

***Defendant's Response:***

Sgt. Harris submitted an affidavit which speaks for itself.

***Plaintiff's Fact #20 in Controversy:***

Corporal Fyfe (white officer) was Plaintiff's training supervisor for driving at one point. In one evaluation written on September 12, 2003, by Cpl. Fyfe, it was noted that the Plaintiff admitted to having night vision problems as a possible reason for his poor driving performance. This came on the heels of a night driving incident.  Cpl. Fyfe told Plaintiff not to worry because all African Americans had trouble seeing in the dark.  (Shaw Affidavit 73).

***Defendant's Response:***

These facts are in controversy.

***Plaintiff's Fact #21 in Controversy:***

On November 15, 2003, Capt. Roper released Plaintiff from training and approved him

for duty.

***Defendant's Response:***

The fact that Captain Roper released Plaintiff from training and approved him for duty is

not in controversy; however, for clarification, Plaintiff was released for courthouse security duty,

not for road patrol.  (See Exhibit 2 to Defendant's Memorandum in Support of Summary

Judgment.)

***Plaintiff's Fact #22 in Controversy:***

On March 29, 2004, the Plaintiff was stopped at a traffic light, while on duty in a county

vehicle, when he was rear ended by another driver.  He sought treatment the same day at

Doctor's Care under workers' compensation coverage.  Plaintiff went to Doctor's Care one time

on March 29, 2004.  He was observed and discharged.  (Shaw Affidavit 93).

***Defendant's Response:***

These facts are not in controversy.

***Plaintiff's Fact #23 in Controversy:***

While on duty at the Courthouse, Shaw met with Lt. Mattox, a new supervisor, in late

September, or early October of 2004.  Shaw explained his concerns about the race discrimination

and harassment he felt he had been subjected to while in his training phases.  Lt. Mattox listened

to the complaints.  (Shaw Affidavit 79).

*Defendant's Response:*

These facts are not in controversy.

*Plaintiff's Fact #24 in Controversy:*

In November of 2004, the Plaintiff's pain in his neck and back reestablished.  Plaintiff decided he had a more serious injury and mentioned it to Sgt. Wade.

*Defendant's Response:*

The fact that the Plaintiff mentioned his back was still hurting from the accident is not in controversy; however, for clarification, Sgt. Wade told Plaintiff to see a doctor and take care of the injury.  The plaintiff did not follow her order to seek medical treatment.  (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.)

*Plaintiff's Fact #25 in Controversy:*

On November 18, 2004, Lt. Mattox and Sgt. Wade spoke to the Plaintiff about his medical problems and told him to contact Jan Watts, the Beaufort County Risk Manager.  (Shaw Affidavit 44).

*Defendant's Response:*

The fact that Lt. Mattox and Sgt. Wade spoke with the Plaintiff about his medical problems is not in controversy; however, for clarification, both Sgt. Wade and Lt. Mattox ordered the plaintiff to see a doctor and take care of the injury and to pursue his workers' compensation claim.  The plaintiff did not follow these directives.  (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

*Plaintiff's Fact #26 in Controversy:*

At the November 18, 2004 meeting, Shaw again told Mattox that he felt like he had been

treated unfairly during training because of his race, and mentioned being subjected to racist comments by his training supervisors. (Shaw Affidavit 80).

**Defendant's Response:**

These facts are in controversy.

**Plaintiff's Fact #27 in Controversy:**

As instructed, Plaintiff contacted Jan Watts to request that he be evaluated for further treatment. It was at this time that Plaintiff was informed by Jan Watts that his workers' compensation claim had expired and that Plaintiff would have to seek medical treatment and a resolution of his claim through the private sector (pay for his own medical treatment and sue the other driver privately to seek compensation for his medical bills). (Shaw Affidavit 54-46; Exhibit # 2 to Plaintiff response to Summary Judgment, a letter from Jan K. Watts).

**Defendant's Response:**

The fact that the Plaintiff was told by Jan Watts that his claim had expired is not in controversy; however, for clarification, the plaintiff never followed up on medical treatment and therefore the time to pursue his claim expired. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

**Plaintiff's Fact #28 in Controversy:**

A week or so after his meeting with Lt. Mattox and Sgt. Wade, Plaintiff was working in the courthouse when Sgt. Wade asked Plaintiff to move the file cabinet. He made the attempt, and felt a sharp pain in his back. He said "ouch! I hurt myself!" Sgt. Massey was present, and observed this. Plaintiff notified her that he had hurt his back. He took several Advil and worked out the rest of the day after reporting the incident to Katrina Polite. (Shaw Affidavit 49).

***Defendant's Response:***

These facts are in controversy because Sgt. Massey was never employed by the Defendant and is an employee of the Port Royal Police Department.  In addition, Katrina Polite was never in a supervisory position over the Plaintiff thus any report the Plaintiff made to Katrina Polite of his injury would not be in accordance with the Defendant's chain of command protocol.

***Plaintiff's Fact #29 in Controversy:***

On December 9 , about a week one (l) later Sgt. Wade called Plaintiff to her desk, and then told him to never mind she was going to ask him to move the cabinet again, but had decided to ask Sgt. Fanger to handle it instead, as Shaw had reminded her that his back was still hurting. (Shaw Affidavit 51).

***Defendant's Response:***

These facts are in controversy.

***Plaintiff's Fact #30 in Controversy:***

The next day, Sgt. Wade asked Sgt. Fanger to handle moving the cabinet.  Shaw was present and ready to help, but Sgt. Fanger told him to wait until they got another officer to help them.  While they were waiting, Capt. Roper called them into his office and demanded to know whether Shaw had been asked to move the cabinet, and whether he had refused to do it.  Capt. Roper asked several questions about Shaw's medical condition, accused Shaw of never having contacted Watts at all (Wade claims to have been aware, at this point that Shaw did contact Watts and was denied coverage for treatment, although she did not speak up in Shaw's defense). Roper suspended Plaintiff on the spot, but did not punish Fanger.  (Shaw Affidavit 55-57).

***Defendant's Response:***

These facts are in controversy.

***Plaintiff's Fact #31 in Controversy:***

On December 10, 2004, Lt. Mattox recommended that Shaw be terminated, as did Sgt. Wade, who now claimed that she had ordered Shaw to report to her on what Watts had told him. Wade also claimed that Watts had instructed the Plaintiff to get further medical attention from a private physician in order to be evaluated for workers comp. treatment.

***Defendant's Response:***

The fact that Lt. Mattox and Sgt. Wade recommended Shaw's termination is not in controversy; however, for clarification both recommendations were for insubordination, failing to get medical attention. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

***Plaintiff's Fact #32 in Controversy:***

On December 13, 2004, Lt. Col. David Brown also recommended termination of the Plaintiff. The Plaintiff was terminated on December 13, 2004, allegedly for insubordination.

***Defendant's Response:***

This fact is not in controversy.

***Plaintiff's Fact #33 in Controversy:***

At the time that the Plaintiff was terminated, the Insubordination that Defendant claimed Plaintiff had committed was allegedly refusing to follow up with Jan K. Watts or not cooperating with Mr. Watts office in order to get workers compensation treatment for his injuries.

***Defendant's Response:***

These facts are not in controversy; however, for clarification, Plaintiff was insubordinate in not following through on his worker's compensation claim and medical treatment even though he was still injured from the accident.  (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

***Plaintiff's Fact #34 in Controversy:***

After his termination, Plaintiff contacted Mr. Watts, and Mr. Watts wrote Plaintiff a letter, explaining that Mr. Shaw had contacted him when Shaw said he did, that Mr. Watts had told Shaw that there was no workers' compensation coverage, and that Shaw would have to pursue any treatment at his own expense, and, finally, that Mr. Shaw had not failed to comply or cooperate with Mr. Watts' department.  This letter is attached as Exhibit #2 to the Plaintiff Response to Summary Judgment.

***Defendant's Response:***

These facts are not in controversy; however, for clarification, there was no longer worker compensation coverage because the Plaintiff allowed the claim to expire by not following up with medical treatment needed for his full recovery.  (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

## IV.    SUMMARY JUDGMENT STANDARD

Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To

the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id., quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The Defendants, as the moving parties, bear the initial burden of pointing to the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the Defendants carry this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718-19, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id. and Doyle v. Sentry Inc.*, 877 F.Supp. 1002, 1005 (E.D.Va. 1995). Instead, the non-moving party is required to submit evidence of specific facts by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber, citing Celotex Corp., supra.* Moreover, the non-movant's proof must meet "the substantive evidentiary

standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) *and DeLeon v. St. Joseph Hospital, Inc.*, 871 F.2d 1229, 1233 n. 7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Technologies Applications & Servs. Co.*, 80 F.3d 954 (4th Cir. 1996). In addition, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## V.   ANALYSIS

### A.  Whether Plaintiff Timely Effected Service

The Defendant asserted as an affirmative defense in its Answer, Amended Answer, and memorandum in support of its motion for summary judgment that the Plaintiff failed to timely serve the Summons and Complaint upon it, and thus the Complaint should be dismissed pursuant to Fed.R.Civ. P. 12(b)(5) and/or 12(b)(6).[1]

### 1.  Filing

Title 42, U.S.C. § 2000e-5(f)(1), provides that a person who receives a "right-to-sue" notice from the United States Equal Employment Opportunity Commission ("EEOC") must file any civil action against the respondent named in the charge in either state or federal court within 90 days after the giving of such notice. The Fourth Circuit strictly adheres to the 90-day rule. *See Watts-Means v. Prince George's Family Crisis Center*, 7 F.3d 40 (4th Cir. 1993) (a lawsuit

---

[1]        *See* Defendant's Memorandum [22-2] at p. 7.

commenced 95 days after plaintiff received her right-to-sue letter from the EEOC was barred by

the 90-day rule); *Harvey v. City of New Bern Police Dept.*, 813 F.2d 652 (4th Cir. 1987)

(plaintiff's claim under Title VII was barred where his lawsuit was commenced 91 days after he

received a right-to-sue letter from the EEOC); *Dixon v. Digital Equipment Corp.*, 976 F.2d 725

(4th Cir. 1992) (Table) (Fourth Circuit affirmed the district court's grant of summary judgment

to the defendant because pro se plaintiff filed on the 91st day after receiving the right-to-sue

letter).

In the present case, the EEOC Dismissal and Right to Sue letter was dated August 31,

2005, and Plaintiff timely filed his complaint on November 21, 2005, which by this court's count

is 83 days after the date of Notice of Right to Sue.

## 2. Service

Although the Plaintiff filed the Complaint on November 21, 2005, the Plaintiff failed to

serve the complaint on the Defendant in the manner required by the Federal Rules of Civil

Procedure.  Rule 4(j)(2) requires:

> Service upon a state, municipal corporation, or other governmental organization subject to suit shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state for the service of summons or other like process upon any such defendant.

The Federal Rules require a party to serve a state governmental entity pursuant to the state rules.

In South Carolina, sheriffs are state officials.  *Gulledge v. Smart*, 691 F. Supp. 947, 954-955

(D.S.C. 1988); *Cone v. Nettles*, 308 S.C. 109, 112 (1992).  The South Carolina Rules of Civil

Procedure require that a state official be served in the following manner:

> Upon an officer or agency of the State by delivering a copy of the summons and complaint to such officer or agency and by sending a copy of the summons and complaint by registered or certified mail to the Attorney General at Columbia.

S.C.R.C.P. Rule 4(d)(5).  The Plaintiff's attorney, however, mailed the Summons and Complaint to the Defendant via certified mail,[2] which was not proper service.

Under some circumstances (which are not present here), failure to effect service is curable.  Nevertheless, because the Defendant has never been served with process it is now entitled to dismissal under Rule 4(m) of the Federal Rules of Civil Procedure, which allows a plaintiff 120 days "after the filing of the complaint" to serve the defendant with the summons and complaint.  Pursuant to Rule 4(m):

> If service of the summons and complaint is not made upon a defendant within one hundred and twenty (120) days after the filing of the complaint, the Court, upon motion or on its own initiative after notice to the Plaintiff, shall dismiss the action without prejudice as to that Defendant ... provided that if the Plaintiff shows good cause for the failure, the Court shall extend the time for service for an appropriate period.  Fed.R.Civ.P. 4(m).

Here, the time for service began to run on the date of filing the complaint (November 21, 2005), and the one hundred and twenty (120) day period for service provided by Rule ended on March 21, 2006.  The Plaintiff failed to serve the Defendant within 120 days of filing the initial complaint, and then never properly served the Defendants with his Amended Complaint.  The Defendant preserved the affirmative defense by asserting it in both its Answer and its Answer to the Amended Complaint.  The Plaintiff has been on notice since April 2006 that the complaint was never properly served, but the Plaintiff never effected proper service.

Although a district court has the authority to extend the time for service for an appropriate period after the Plaintiff has established a good cause for failing to serve the Defendant, the Plaintiff has not requested that the court grant it an extension of time to effect service, and it has not set forth any good cause for failing to serve the Defendant as required by

---

[2]     *See* Defendant's Exhibit 10, attached to Defendant's Memorandum.  [22-2]

the Rule.  Over one year has elapsed since the EEOC issued its Notice of Rights letter, but the

Defendant has yet to be served properly.  In *Anderson v. City of Rock Hill*, 2005 WL 3968035 at

*2 (D.S.C. 2005), the *pro se* Plaintiff argued that he had "good cause" for not serving the

Defendants because he was looking for work, could not afford the fees associated with the

service by the sheriff, and was busy pursuing a state cause of action.  Judge Currie held that the

Plaintiff's complaint should be dismissed without prejudice.  *Id*.  The court observed that

generally, a dismissal without prejudice would mean that Plaintiff would be able to refile his

case and thereafter properly effect service within the 120-day period.  In *Anderson*, however, the

district court noted that while the action would be dismissed without prejudice, Plaintiff's statute

of limitations period for filing a suit under Title VII had expired, and noted that "'[w]ithout

prejudice' does not mean 'without consequence.'"  *Anderson*, 2005 WL 3968035 at *2, *quoting

Powell v. Starwalt*, 866 F.2d 964, 966 (7th Cir. 1989).

In *Anderson*, the pro se plaintiff failed to set forth "good cause" which would allow the

district court to extend the time for service.  In this case, the Plaintiff first argues that because the

initial complaint was served within ninety days of the EEOC's letter, this action has been timely

commenced.[3]  Plaintiff contends that Rule 15, which permits that a party may amend that party's

pleading once as a matter of course at any time before a responsive pleading is served, can be

construed to allow the Plaintiff to have commenced this action within fewer than 90 days of the

receipt of the Right to Sue letter.  Plaintiff argues that because the Amended Complaint relates

back to the date of the original Complaint pursuant to Rule 15(b), and the original complaint was

filed within 90 days of the receipt of the right to sue letter, the filing is timely.  In support of this

---

[3]        *See* Plaintiff's Response [26] at p. 7.

argument, Plaintiff relies on *Pardazi v. Cullman Medical Center*, 896 F.2d 1313 (11 Cir. 1990), which held that a Title VII action does not require service of process for subject matter jurisdiction.  The *Pardazi* court held that because the defendant had failing to raise the issue of whether service was untimely, the defendant had waived any right to challenge the sufficiency of service on summary judgment.  The court is not persuaded by this argument, however, because the Defendant has consistently claimed that it was not properly served.

Although the Plaintiff contends that the "Defendant waived sufficiency of service by filing an Answer and failing to raise sufficiency of service of process as a pre-answer motion to dismiss,"[4] the court disagrees.  As the record reflects, the Defendant preserved the affirmative defense by asserting it in both its Answer and its Answer to the Amended Complaint.  In addition, *Pardazi* is inapplicable to the instant case because the Defendant in this case has raised the issue of insufficient service.  The Plaintiff has been on notice of the defense since April 2006, but despite this notice, the Plaintiff has done nothing to effect service.  Thus, it is recommended that this case be dismissed without prejudice for failure to effect service on the Defendant within the time period prescribed by the Federal Rules.  *See Anderson*.

Although it is recommended that this action be dismissed because the Plaintiff failed to properly serve the Defendant, the court will address Plaintiff's claims on their merits.  Each of Plaintiff's causes of action against the Defendant will be discussed below.

### B.  First Cause of Action: A Racially Hostile Work Environment Under Title VII

Under Title VII of the Civil Rights Act of 1994, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation,

---

[4]     *See* Plaintiff's Response [26] at p. 9.

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Plaintiff alleges that the Defendant engaged in racial harassment and created a hostile work environment. To establish a prima facie case for hostile environment racial harassment, the plaintiff must show (1) that the conduct in question was unwelcome, (2) that the harassment was based on his race, (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer. *Norris v. City of Anderson*, 125 F.Supp.2d 759, 765 (D.S.C. 2000), *citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987). If the plaintiff meets this initial burden, then the employer may still prevail if it proves that either the events did not take place, they were isolated or genuinely trivial, the employer took prompt remedial action reasonably calculated to end the harassment, or the employer was unaware of the harassment. *Norris*, 125 F.Supp.2d at 765, *citing Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983) *and Dwyer v. Smith*, 867 F.2d 184, 187 (4th Cir. 1989).

Plaintiff bases his racially hostile work environment and racial discrimination claims on the following statements:

1.  Plaintiff states that Sgt. Slupski called him "boy" on one occasion when Sgt. Slupski was angry with him and sent him home for the day. (Shaw Affidavit 68)

2.  Plaintiff described a conversation in which Slupski asked Plaintiff if Plaintiff thought Slupski was a racist, and then went on to say that Shaw might observe Slupski making a race or watermelon joke with Slupski's wife, but that Slupski did not believe in that whole slavery thing. (Shaw Affidavit 63).

3.  Plaintiff testified that Calandra called Plaintiff "Rico Suave," and asked him if he spoke Spanish, references to Calandra thinking Plaintiff had Mexican or Latino heritage. (Shaw Affidavit 70).

4.  Plaintiff testified that Calandra, on occasion, had mimicked a voice and accent which Calandra

said were supposed to portray an uppity black person.  (Shaw Affidavit 71)

5.     Plaintiff testified that he was referred to constantly as "bo," a term he interpreted as short for "boy,"
       a known racial epithet against African American men.  (Shaw Affidavit 65-69)

Plaintiff argues he was subjected to unwanted racial harassment by his supervisors,

thereby making the Defendant aware of the conduct, and relies on *Farragher v. Boca Raton*, 524

U.S. 775, 787 (1998), which established strict liability for employers where a supervisor was the

one who engaged in unlawful harassment.  Plaintiff argues that he has satisfied the elements of

racial harassment "as to all elements except, perhaps the issue of whether the comments, taken as

a whole constitute a hostile work environment."[5]

To state a hostile environment claim, the work environment "must be both objectively

and subjectively offensive, one that a reasonable person would find hostile or abusive, and one

that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 118

S.Ct. 2275, 2282, 141 L.Ed.2d 662 (1998), *citing Harris*, 510 U.S. at 21, 114 S.Ct. 367.  As

*Norris* teaches, "[n]ot all workplace conduct that may be described as 'harassment' affects a

'term, condition, or privilege' of employment within the meaning of Title VII.  *Norris*, 125

F.Supp. at 765, *citing Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91

L.Ed.2d 49 (1986).  To prove a hostile environment claim, a plaintiff must be able to show more

than a mere utterance of an epithet which engenders offensive feelings in an employee, as this

does not sufficiently affect conditions of employment to constitute actionable harassment.

*Harris*, 510 U.S. at 21, 114 S.Ct. 367.  "An isolated racial remark, even though offensive and

entirely inappropriate, does not establish an abusive working environment."  *Williams v. Prince*

*Georges County Hosp. Ctr.*, 932 F.Supp. 687, 689 (D.Md. 1996), *aff'd,* 103 F.3d 122 (4th Cir.

---

[5]          *See* Plaintiff's Response [26] at p. 11.

1996); *see also Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2nd Cir. 1986).  "Title VII is not a federal guarantee of refinement and sophistication in the workplace[.]"  *Hartsell v. Duplex Prod.*, Inc., 123 F.3d 766, 773 (4th Cir. 1997).  In *Faragher*, the Supreme Court held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms or conditions of employment."  118 S.Ct. at 2283.

Under the *Faragher* analysis, the work environment "must be both objectively and subjectively offensive."  Plaintiff contends that his work environment was subjectively offensive because he understood the term "bo" meant "boy."  With respect to whether the work environment was objectively offensive, Plaintiff argues that "the objective person can not know what bo means, observes that it is only used towards black men by white men, and the person must have been told by supervisors and other officers, upon asking, that bo is short for boy and it is a racially derogatory term."[6]

In response, Defendant claims "the word 'Bo' is a southern term for friend or buddy that is commonly used throughout BCSO to address fellow deputies in a general manner regardless of rank, race or national origin."[7]  Plaintiff claims there is a genuine issue of material fact "as to whether the constant use of the term, in addition to the other comments which were clearly racial in nature, could be sufficient to create a racially hostile work environment."[8]

Putting aside for a moment Slupski's use of the term "boy", the parties disagree about the

---

[6]     Plaintiff's Response [26] at p. 12.  In his deposition, Plaintiff testified he only remembered African-Americans and Hispanics being called "bo".  *See* Plaintiff's Deposition, attached to Defendant's Memorandum as Exhibit 6, at page 51, lines 16-24 and page 52, lines 1-6.

[7]     Defendant's Memorandum [22-2] at p. 10.

[8]     Plaintiff's Response [26] at p. 12.

meaning of the term "bo." The undersigned is mindful that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Taking the evidence in the light most favorable to the Plaintiff as the non-moving party, Plaintiff has not set forth a prima facie case of a racially hostile work environment in violation of Title VII; even assuming, without deciding, that Plaintiff could established that the (1) harassment was unwelcome, and (2) based on race, he cannot satisfy the third prong of the test, because the Plaintiff has not shown that use of the word "bo" was (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment. Whether an environment is hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). There is no evidence that the use of the word "bo" when referring to Plaintiff constitutes such severe or pervasive harassment as to alter the conditions of employment, or create an abusive environment. At most, the use of the word was a "mere offensive utterance." *See Harris*. With respect to the word "bo," the court is of the opinion that while it was offensive to Plaintiff, the use of the word does not amount to conduct that is severe enough to create an objectively hostile or abusive work environment. The court is mindful that "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399

Next, Plaintiff claims that Slupski called him "boy" one time.  The use of this word towards Plaintiff is reprehensible, but it also was an isolated incident, and therefore it cannot be said that it permeated Plaintiff's work environment with discriminatory insult and abuse.  *See, e.g., Belton v. City of Charlotte*, 175 Fed. Appx. 641, 657-58 (4th Cir. 2006) (per curiam) (holding that the plaintiff hearing the use of the word "nigger" one time, some twenty years earlier, did not permeate plaintiff's work environment with discriminatory insult and abuse).  Slupski's use of the word "boy" when addressing Plaintiff on one occasion simply cannot amount to a "discriminatory change[] in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks and citation omitted).  Thus, it is insufficient to satisfy the "severe or pervasive" prong of the prima facie case.  *See id.* at 788, 118 S.Ct. 2275 (noting that isolated incidents of abusive language will generally not meet requisite threshold of severity or pervasiveness) (*citing Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80-82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

Finally, Plaintiff's allegations regarding his conversation with Slupski (*see supra* at 24), and his conversations with Calandra (*see supra* at 24), are again isolated incidents which cannot, individually or together, be viewed as permeating Plaintiff's work environment with discriminatory insult and abuse.  Granted, these conversations were offensive to Plaintiff, but these few conversations cannot be said to have been sufficiently severe or pervasive to create an abusive working environment.  It is this court's opinion that the Plaintiff has failed to present sufficient facts to withstand the Defendant's Motion for Summary Judgment with respect to his claim of racial harassment and hostile work environment.

### C.  Second Cause of Action:  Racial discrimination (disparate treatment)

Plaintiff also alleges he suffered racial discrimination in the form of disparate treatment and termination from employment.  First, the Plaintiff also claims he was subject to disparate treatment by his supervisors, and testified that he was made to do an unfair share of the paperwork; his reports were re-written by his superiors to make him look incompetent; he was not trained correctly, he had false write-ups filed against him by his superiors, and he was disciplined for not following orders while other deputies were not so disciplined.  The Plaintiff also alleges that he was harassed and discriminated against during field training in an effort by the Defendant to have him terminated.  This allegation rings false, however, because the record shows that Defendant's supervisors gave Plaintiff two chances to complete field training and when Plaintiff could not pass, he was not terminated, but transferred to duty at the county courthouse.  Lt. Col. David Brown, an African-American, recommended that Plaintiff be transferred, and ultimately recommended that he be terminated.

With respect to his adverse employment action (termination), the Plaintiff claims that he and his supervisor, Sgt. Fanger, were ordered to move a file cabinet from the courthouse back to BCSO.  Plaintiff contends that both officers later were called into Captain Roper's office and reprimanded for not moving the cabinet.  The Plaintiff claims that he was suspended by Roper but nothing happened to Sgt. Fanger.  The record shows that he was suspended for insubordination in neglecting to obey direct orders to follow up on his workers' compensation claim, for failing to report he was still injured, and failing to provide Sgt. Wade with a status report.

There are two methods of proving a case of intentional discrimination under Title VII:

the method set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (mixed-motive) and

the method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)(pretext).

Under the *McDonnell Douglas* paradigm of analysis, as refined in *St. Mary's Honor Ctr. v.

Hicks*, 509 U.S. 502 (1993), and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the plaintiff has the initial burden of demonstrating a

prima facie case of discrimination.  To establish a prima facie case, plaintiff must show (1) he is

a member of a protected class; (2) he was qualified for his job and his job performance was

satisfactory; (3) he suffered an adverse employment action; and (4) other employees who are not

members of the protected class did not suffer an adverse employment action under apparently

similar circumstances.  *Bryant v. Bell Atlantic Maryland*, Inc., 288 F.3d 124, 133 (4th Cir. 2002).

Under some circumstances, the fourth element can be established by presenting evidence raising

an inference of discrimination.  *See Miles v. Dell*, *Inc.*, 429 F.3d 480, 486-87 (4th Cir. 2005);

*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir. 2001)(*citing Texas Dept. of

Community Affairs v. Burdine*, 450 U.S. 248 (1981)). Once plaintiff has established a prima facie

case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the

termination.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 ((1981).  This is

merely a burden of production, not of persuasion.  *St. Mary's Honor Center v. Hicks*, 509 U.S.

502, 506 (1993.  Once the defendant has met its burden of production by producing its

legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non."

*Reeves*, 530 U.S. at 143, (*citing Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716

(1983)).  In other words, the burden shifts back to the plaintiff to demonstrate by a

preponderance of the evidence that the legitimate reasons produced by the defendant were not its

true reasons, but were a pretext for discrimination.  *Reeves*, 530 U.S. at 143.  During all of the

burden shifting scheme set forth in *McDonald Douglas*, the ultimate burden of proving that

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

The plaintiff also may proceed under the mixed-motive method of establishing

intentional discrimination.  Under this method, a plaintiff must present sufficient evidence, direct

or circumstantial, that, despite the existence of legitimate, nondiscriminatory reasons for the

adverse employment action, an illegal factor (i.e., race) was a motivating factor in the decision.

*Hill*, 354 F.3d at 284-86.  Plaintiff need not show race was the sole motivating factor but only

that it was a motivating factor.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  The racial bias

must come from a relevant decision maker.  Also, the protected trait "must have actually played

a role in the employer's decision making process and had a determinative influence on the

outcome."  *Hill*, 354 F.3d at 286.

Regardless of which method is used to analyze the claim, the plaintiff has the ultimate

burden of presenting evidence from which a reasonable jury could conclude defendant

intentionally discriminated against him based on his race.  It is not necessary to decide "whether

the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the

plaintiff's termination."  *Hawkins v. Pepsico*, 203 F.3d 274, 279 (4th Cir. 2000)(*quoting and

citing DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299(4th Cir. 1998) ("[T]his Court does not sit

as a kind of super-personnel department weighing the prudence of employment decisions made

by firms charged with employment discrimination[.]" (internal quotation marks omitted));

*Jiminez v. Mary Washington College,* 57 F.3d 369, 377 (4th Cir. 1995) ("Title VII is not a

vehicle for substituting the judgment of a court for that of the employer").  It is the perception of

the employer that is critical. *Hawkins*, 203 F.3d at 280. Even a reasoned decision based on incorrect facts is not evidence of pretext. *Pollard v. Rea Magnet Wire Co.*, 824 F.3d 557, 559 (7th Cir. 1987), *cert. denied*, 484 U.S. 977 (1987).

In the present case, Plaintiff meets the first and third prongs of the prima facie case of race discrimination: as a black male, he is a member of a protected class and he suffered an adverse employment action when the Defendant terminated his employment. Furthermore, the Defendant has conceded by Brief that Plaintiff also met the second prong of the test ((2) he was qualified for his job and his job performance was satisfactory) by stating: "[Plaintiff's] performance evaluations a year before [events leading to his termination] show that his performance had improved."[9] Nevertheless, the Defendant argues that its reasons for terminating Plaintiff are supported by legitimate, non-discriminatory reasons. According to Defendant, at some time around November 18, 2005, Sgt. Jackie Wade, an African-American female, found out that the Plaintiff was still having physical problems from his motor vehicle accident. According to Sgt. Wade, on that day, Sgt. Wade and Lt. Mattox spoke to Plaintiff about his medical problems. Sgt. Wade instructed Plaintiff to contact Mr. Jan Watts, Beaufort County Risk Management, for assistance with those problems and his worker's compensation claim, and provide a status report to her. The Plaintiff failed to provide any information to Sgt. Wade. On December 9, 2004, Sgt. Wade told Plaintiff to take the criminal case file cabinet from the courthouse to the Beaufort County Law Enforcement Complex. Plaintiff told Sgt. Wade that he was experiencing pain from his automobile accident, and that he had not gone to a doctor. Sgt. Wade told Plaintiff to make an appointment to see a doctor. On December 10, Sgt. Wade talked

---

[9]        Defendant's Memorandum [22-2] at p. 12.

to Lt. Mattox, who told her to contact Mr. Watts regarding the status of Plaintiff's claim; Watts told Sgt. Wade that he had told Plaintiff to seek medical attention from a private physician to determine whether his pain was due to the March 2004 vehicle collision.

Sgt. Wade recommended termination of Plaintiff's employment to Lt. Mattox because Plaintiff had failed to follow three direct orders from his superiors, which violated General Order No. 13.[10] Lt. Mattox reviewed the disciplinary memo and recommended termination to his supervisor, Captain Roper. This recommendation made its way up the chain of command and was affirmed by Lt. Col. David Brown. Chief Deputy Michael Hatfield reviewed the recommendations and supporting memo and determined that the Plaintiff failed to obey direct orders in violation of BCSO policy General Order No. 13.58. The Plaintiff's termination was done pursuant to BCSO's Standard Operating Procedure No. 202.59 According to Sgt. Wade, Plaintiff was terminated because he failed to follow direct orders, not because of his race.[11]

In order to present a prima facie case, the Plaintiff must show that BCSO's reasons for terminating him were not insubordination but were a pretext for discrimination. The Plaintiff admitted that he did not report to his superiors that he was still experiencing pain from his accident as he was required to do by BCSO'S Standard Operating Procedures. The Plaintiff admitted that he waited over a month or more before contacting risk management about his re-occurrence of pain from his accident. Lastly, the Plaintiff admitted that he did not ever see a physician or make an appointment with a physician for his pain after his initial visit to Doctor's Care as directed to do by Sgt. Wade. Given this evidence, the court recommends that summary

---

[10]     Legree (nee Wade) Affidavit , attached to Defendant's Memorandum as Exhibit 12.

[11]     Legree (nee Wade) Affidavit , attached to Defendant's Memorandum as Exhibit 12.

judgment be granted in favor of the Defendant with respect to Plaintiff's second cause of action.

### D.  Third Cause of Action:  Retaliation and Wrongful Termination

Plaintiff also alleges he was terminated on December 13, 2004 in retaliation for participating in protected acts of reporting racial discrimination to Lt. Mattox, Sgt. Harris, Officer Spencer, and Officer Mendoza, and opposing discrimination.  For the reasons discussed below, it is recommended that summary judgment be entered in favor of the Defendant with respect to Plaintiff's third cause of action because he cannot establish a prima facie case of retaliation.

Title VII prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, an employment practice made unlawful under Title VII.  *See* 42 U.S.C. § 2000e-3(a).  Protected activities may include 'opposition' or 'participation' activities.  *See, e.g., Kubicko v. Ogden Logistics Services*, 181 F.3d 544, 552 (4th Cir.1999); 42 U.S.C. § 2000e-3 (a) (prohibiting discrimination against an employee for opposition to an unlawful employment practice or because the employee has made a charge or participated in an investigation under the statute).

Recently, in *Crosby v. City of Walterboro, South Carolina*, 444 F.Supp.2d 559, 562-63 (D.S.C. 2006), the district court held that to establish a prima facie case of retaliation under Title VII, a plaintiff must show that:  (1) he engaged in a protected activity; (2) the defendant took an adverse employment action against him; and (3) a causal connection existed between the protected activity and the adverse employment action.  *See, e.g.*, *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001); *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 180 (4th Cir. 1998).  Under the burden-shifting scheme, if Plaintiff succeeds in

proving a prima facie case, the burden of going forward shifts to Defendant to provide evidence of a legitimate non-discriminatory reason for taking the adverse employment action. *See Crosby*, 444 F.Supp. 2d at 562 n.2, *citing Matvia v. Bald Head Island Manag.*, 259 F.3d 261, 271 (4th Cir. 2001); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000). Should Defendant articulate a non-discriminatory reason, the burden then shifts back to Plaintiff to demonstrate that Defendant's proffered reason is a pretext for retaliation. *Crosby*, 444 F.Supp.2d at 562 n.2, *citing Smith*, 202 F.3d at 248.

Sometime around late June or July of 2003, Plaintiff was transferred to courthouse duty due to his substandard performance while assigned to field training on road patrol. After this transfer, the Plaintiff was still under evaluation by his supervisors until they determined he was performing his duties according to BCSO standards. Plaintiff testified that shortly after he was transferred to courthouse duty, he told Lt. Mattox, his supervisor at the courthouse, of the alleged discrimination he had faced while in training. However, the record shows that he had been assigned to courthouse duty for over a year (June 2003 to December 2004) before he was disciplined and ultimately terminated. There is nothing in his courthouse duty performance evaluations to suggest that his supervisors were manufacturing reasons to have the Plaintiff terminated. To the contrary, the evaluations reveal that his performance was improving. In fact, the recommendation for the Plaintiff's disciplinary action was initiated by Sgt. Wade, to whom he never reported any racial discrimination. The disciplinary action was taken because of the Plaintiff's insubordination and violation of BCSO policy, and appears unrelated to, and too remote in time for the court to connect the disciplinary action to with complaints the Plaintiff claims he made to Lt. Mattox over a year earlier. The recommendation for the Plaintiff's

disciplinary action was affirmed by Lt. Mattox and was forwarded up the chain of command. The Plaintiff cannot show that there was a causal connection between his protected activity of reporting discrimination to Lt. Mattox in the summer of 2003 and his discipline and ultimate termination in December of 2004. This Court believes that Plaintiff has failed to present sufficient facts to withstand Defendant's Motion for Summary Judgment with respect to his claim of retaliation.

### E.  Fourth Cause of Action:  Wrongful termination as a Result of Pursuing a Claim for Workers Compensation Against BCSO

Plaintiff's final cause of action alleges he was wrongfully terminated for instituting and pursuing a claim for workers' compensation against BCSO. S.C. Code Ann. §41-1-80 states in pertinent part:

> No employer may discharge or demote any employee because the employee has instituted or caused to be instituted, in good faith, any proceeding under the South Carolina Workers' Compensation Law[.]
>
> The burden of proof is upon the employee[.]
>
> Any employer shall have as an affirmative defense to this section the following:…violating specific written company policy for which the action is a stated remedy of the violation.
>
> The statute of limitations for actions under this section is one year.

First, as discussed above, this court finds that the Plaintiff never properly served BCSO with the complaint or the amended complaint. The plaintiff had one year from the date of his termination, December 13, 2004, to bring an action pursuant to this statute, or if the statute of limitations had run before service was effected, then properly serve the complaint within 120 days of filing the complaint. S.C.R.C.P. Rule 3(a). It is recommended that this cause of action be dismissed because the Plaintiff never properly served BCSO and the statute of limitations has run on this cause of action.

In the alternative, it is recommended that this cause of action be dismissed because BCSO has an affirmative defense to this cause of action; BCSO alleges that the Plaintiff was in violation of written BCSO policy when he failed to report his continuing medical condition to his superior officers, provide Sgt. Wade with a status report of his workers' compensation claim as directed, and obtain treatment for his medical condition as directed.

The Plaintiff has the burden of showing that he would not have been terminated but for his worker's compensation claim. *Wallace v. Milliken & Co.*, 305 S.C. 118, 406 S.E.2d 358 (1991). "To prove a workers' compensation retaliatory discharge claim under S.C. Code Section 41-1-80, a plaintiff must establish three elements: (1) institution of workers' compensation proceedings; (2) discharge or demotion; and (3) a causal connection between the first two elements." *Hinton v. Designer Ensembles,* Inc., 343 S.C. 236, 540 S.E.2d 94, 97 (2000) (*citing Hines v. United Parcel Service, Inc.*, 736 F.Supp.675, 677 (D.S.C. 1990)). The appropriate test of causation under Section 41-1-80 is the "determinative factor" test. *Hinton*, 343 S.C. at 242, 540 S.E.2d at 97 (*citing Wallace v. Milliken & Co.*, 305 S.C. 188, 406 S.E.2d 358 (1991)). The determinative factor test requires the employee establish that he would not have been discharged "but for" the filing of the workers' compensation claim. *Hinton*, 343 S.C. at 242, 540 S.E.2d at 97 (*citing Wallace*, 305 S.C. 188, 406 S.E.2d 358).

BCSO concedes that the Plaintiff filed a workers' compensation claim and that he was ultimately terminated. Significantly, however, there is no evidence in the record to suggest that Plaintiff was terminated <u>because</u> he filed a workers' compensation claim. The Plaintiff was terminated nine months after he filed his claim for not following up on his claim and failing to get the medical treatment he needed. Therefore, Plaintiff's claim for retaliatory termination

pursuant to Section 41-1-80 is without merit.

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the **Defendant's Motion for Summary Judgment [22] be granted.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

May 4, 2007

Charleston, South Carolina