IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

RECEIVED
USDC CLERK, CHARLESTON, SC

2007 OCT -1  P 12: 52

| | |
|---|---|
| Carlton Shaw, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Beaufort County Sheriff's Office, | ) |
| | ) |
| Defendant. | ) |

Civil Action No. 9:05-3253-SB

**ORDER**

This matter is before the Court upon Plaintiff Carlton Shaw's ("the Plaintiff" or "Shaw") complaint, which alleges causes of action against his former employer, the Beaufort County Sheriff's Office ("BCSO"), for racial harassment, race discrimination (disparate treatment), and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e to 2000e17, as well as wrongful termination in violation of S.C. Code Ann. § 41-1-80. The record contains a report and recommendation ("R&R") of a United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B). In the R&R, the Magistrate Judge recommends that the Court grant the Defendant's motion for summary judgment. The Plaintiff filed written objections to the R&R, and the Defendant filed a reply to the Plaintiff's objections. See 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to a Magistrate Judge's R&R within ten days after being served with a copy). The matter is now ripe for review.

**BACKGROUND**

I.    **Procedural History**

The Plaintiff filed the present action on November 21, 2005. Then, on March 8, 2006, before an answer was filed, the Plaintiff filed an amended complaint. The Defendant

filed its answer on April 17, 2006, generally denying the Plaintiff's claims and also alleging

that the Plaintiff failed to properly serve the summons and complaint on the Defendant.

Thereafter, the Defendant filed an amended answer, again alleging that the Plaintiff failed

to properly serve the summons and complaint on the Defendant and also alleging various

affirmative defenses such as the statute of limitations and the Plaintiff's failure to exhaust

his administrative remedies.

On December 13, 2006, the Defendant filed its motion for summary judgment.  The

Plaintiff filed a response in opposition to the Defendant's motion on January 16, 2007, and

the Defendant filed a reply on January 25, 2007.  The Plaintiff then filed an affidavit in

opposition to the Defendant's motion for summary judgment.  At the direction of the

Magistrate Judge, the parties filed a joint factual brief in March of 2007.  The Magistrate

Judge then filed his R&R in May of 2007.  The Plaintiff filed timely written objections to the

R&R, and the Defendant filed a reply to the Plaintiff's objections.

## II.    Factual History

### A.    Stipulated Facts

The parties have stipulated to the following facts, as set forth in their joint factual

brief:

1.  The Beaufort County Sheriff appointed Carlton Shaw a Deputy on February 3, 2003.
2.  The Plaintiff is an African American male.
3.  Policies and procedures, including the Affirmative Action Plan, are established in the BCSO Standard Operating Procedures.
4.  The Standard Operating Procedures, including the internal complaint procedures, are made known to all deputies during training procedures.
5.  The Plaintiff went to the South Carolina Police Academy on February 23, 2003.



2

6. Upon his return from a successful completion of training at the Academy, the Sheriff assigned the Plaintiff to seven days of field training under the supervision of Corporal Hall.

7. At the end of this training Cpl. Hall issued a report citing the Plaintiff on several weak areas.

8. BCSO Major Darrell Butler reviewed this report and recommended an additional seven days of field training under a different officer.

9. The Plaintiff then began training under BCSO Sergeant Tim Slupski on May 14, 2003.

10. At the end of this training, Sergeant Slupski evaluated the Plaintiff's performance as substandard and recommended that he be terminated, retrained or assigned to another unit which did not include patrol.

11. The Plaintiff reviewed the written evaluation prior to its completion and submission.

12. Rather than terminating the Plaintiff, BCSO assigned him to the courthouse security detail.

13. After reassignment to the courthouse, BCSO gave the Plaintiff additional training.

14. The Plaintiff's duties at the courthouse included scanning patrons at the front entrance, patrolling the courthouse, courtroom security and transporting a mobile file cabinet from the Sheriff's office to the courthouse.

15. On June 12, 2003, the Plaintiff received a substandard performance evaluation in shotgun training.

16. From July 2003 to November 2003, the Plaintiff received seven performance evaluations that revealed he still needed improvement in his driving abilities.

17. On November 15, 2003, BCSO Captain Richard Roper released Plaintiff from training and approved him for duty.

18. On March 29, 2004, the Plaintiff stopped at a traffic light while on duty in a county vehicle and was rear-ended by another driver.

19. The Plaintiff received a copy of the BCSO Standard Operating Procedure.

20. The Plaintiff reviewed and familiarized himself with all BCSO policies and procedures and at all times had access to the written policies and procedures.

21. The Defendant's employees on the job called the Plaintiff "Bo" on several occasions.

22. Initially the Plaintiff went to Doctor's Care, a temporary treatment office, but during his tenure with BCSO, he did not seek follow-up treatment from his primary physician.

23. On November 18, 2004, the Plaintiff told one of his supervisors, Sergeant Jacqueline Wade, that he was still having medical problems from the motor vehicle accident.



3

24.   On November 18, 2004, Lieutenant Mark Mattox and Sergeant Wade spoke to the Plaintiff about his medical problems and told him to contact Jan Watts, the Beaufort County Risk Manager.

25.   Shaw never reported back to either Sergeant Wade or Lieutenant Mattox with a status report.

26.   On December 9, 2004, the Plaintiff told Sergeant Wade that he had not gone to the doctor because, "I don't like doctors and I am procrastinating."

27.   On December 9, 2004, Sergeant Wade ordered Shaw to see a doctor immediately.

28.   On December 10, 2004, Sergeant Wade recommended that BCSO terminate the Plaintiff for insubordination.

29.   Lieutenant Mattox reviewed the situation and recommended the Plaintiff's termination to his superior, Captain Roper.

30.   On December 13, 2004, Sergeant Wade, Lieutenant Mattox, Major Butler, Lieutenant Colonel David Brown and Chief Deputy Michael Hatfield met with the Plaintiff to discuss potential termination; they gave the Plaintiff an opportunity to review all the recommendations and memos prepared by his superiors as well as ask questions and discuss the reason for his termination.

31.   During the meeting in Chief Deputy Hatfield's office, the Plaintiff denied that his superiors ordered him to seek medical attention and refused to sign and date the disciplinary form.

32.   The EEOC sent a Right to Sue letter on August 31, 2005.

33.   The Plaintiff filed a complaint in the Beaufort Division of the U.S. District Court on November 21, 2005, and an Amended complaint on March 24, 2006.

34.   The Plaintiff sent the Complaint to the Defendant by certified mail.

35.   The Plaintiff did not personally serve the Sheriff or his clerk.

(Joint Factual Brief at 1-4.)

**B.    The Plaintiff's Statement of Disputed Facts and the Defendant's Response**

In addition to the stipulated facts set forth above, the Plaintiff provided a list of facts

that he contends are in dispute, and the Defendant responded to the Plaintiff's list.  The

Court has included the Defendant's corresponding response below each of the Plaintiff's

disputed facts:

Plaintiff's Disputed Fact #1:



Plaintiff retired from the NYPD in 2002, and accompanied his wife to South Carolina. She was stationed in Beaufort as a permanently activated Reserve Naval Officer. (Shaw affidavit 7-10)

Defendant's Response:

The fact that the Plaintiff left the NYPD in 2002 is not in controversy; however, this fact is irrelevant, as is any reference to his wife or her duty station.

Plaintiff's Disputed Fact #2:

The Plaintiff successfully completed training at the academy, before being assigned to field training under the supervision of Corporal Hall.

Defendant's Response:

These facts are not in controversy; however, for clarification, the Plaintiff was first assigned to Field Training with Officer Rodriguez, then Officer Hall, then Sgt. Slupski, and finally Officer Norberg.

Plaintiff's Disputed Fact #3:

Based on his experience with the NYPD, Plaintiff qualified to be a corporal. However, this rank was kept in abeyance pending his completion of training under another officer.

Defendant's Response:

These facts are in controversy because Plaintiff would not qualify to be a corporal until he successfully passed field training. Plaintiff did not complete his initial training and had difficulty throughout his orientation and field training. His trainers finally cleared him from training and assigned him to the courthouse where he was given the rank and pay of Corporal.

Plaintiff's Disputed Fact #4:

Hall was Plaintiff's supervisor and trained the Plaintiff for seven (7) shift days.

Defendant's Response:

These facts are not in controversy.

Plaintiff's Disputed Fact #5:



5

Cpl. Hall told Plaintiff to destroy a valid summons. (Shaw Affidavit 17)

Defendant's Response:

This fact is in controversy and is irrelevant to the lawsuit. Cpl. Hall could not destroy a summons which is a numbered citation for which the deputy is accountable. Cpl. Hall ordered destruction of a written notice, a computer generated slip used to notify persons of court dates, roll call, etc.

Plaintiff's Disputed Fact #6:

Hall ordered Shaw to engage in dangerous pursuits of subjects who had engaged in very minor violations, even going so far as to tell Shaw to drive head on towards a dune buggy. (Shaw Affidavit 18-19).

Defendant's Response:

These facts are in controversy and are irrelevant to the lawsuit. Hall ordered Shaw on one occasion to pursue a fleeing individual driving a stolen ATV. Hall ordered pursuit, not a head-on collision course.

Plaintiff's Disputed Fact #7:

Cpl. Hall ordered Plaintiff to throw a bong (drug paraphernalia) into the ocean. Shaw kept it and attempted to have it tested as evidence against the perpetrator. His request was denied. (Shaw Affidavit 22).

Defendant's Response:

This fact is in controversy and is irrelevant to the case.

Plaintiff's Disputed Fact #8:

At the end of this training, Cpl. Hall issued a report citing several weak areas, mainly on those areas where Plaintiff had found Hall decisions to be dangerous, like driving. On the other hand, Cpl. Hall did make several very positive comments about Shaw's abilities. Major Butler reviewed this report and recommended an additional seven (7) days of field training under a different officer.

Defendant's Response:

The fact that Cpl. Hall did make positive comments in those areas that he found the Plaintiff merited the comment is not in controversy; however, Hall's evaluation of the Plaintiff revealed weaknesses in the his knowledge of SC



statutes and laws, poor report writing, poor radio protocol, no sense of urgency when responding to calls and questionable driving abilities. (See Exhibit 2 to Defendant's Memorandum in Support of Summary Judgment.).

Plaintiff's Disputed Fact #9:

The Plaintiff then began training under Sgt. Slupski on May 14, 2003. In Slupski's performance evaluation of the Plaintiff on May 14, 2003, Slupski praised the Plaintiff for his relations with the public and the good judgment Plaintiff exhibited on some calls.

Defendant's Response:

The fact that Sgt. Slupski attempted to praise Shaw where warranted and tried to give Shaw a clean slate to assist him in a fresh approach to training is not in controversy. (See Exhibit 2 to Defendant's Memorandum in Support of Summary Judgment.).

Plaintiff's Disputed Fact #10:

During the early part of the training, Sgt. Slupski, while in the vehicle with Shaw, asked Shaw, do you think I am a racist? He then went on to warn Shaw that he might hear Slupski tell a race or watermelon joke to his wife on occasion, and that Slupski did not believe that whole slavery thing. (Shaw Affidavit 63-64).

Defendant's Response:

These facts are in controversy.

Plaintiff's Disputed Fact #11:

Thereafter, Slupski began to refer to Plaintiff as "bo" almost constantly. (Shaw Affidavit 65).

Defendant's Response:

The fact that Sgt. Slupski referred to Plaintiff as "Bo" is not in controversy; however, for clarification, Sgt. Slupski only occasionally referred to the plaintiff using the term "Bo," a non-racist, general term used by many persons in the lowcountry as a friendly greeting."

Plaintiff's Disputed Fact #12:

On one occasion, when Slupski was angry with Plaintiff and was preparing



to have him go off shift, he called Plaintiff "boy." (Shaw Affidavit 67)  Shaw recognized "boy" when used in anger by a white man against an African American man to be a racist slur.

Defendant's Response:

These facts are in controversy.

Plaintiff's Disputed Fact #13:

Plaintiff observed that Slupski and another Sergeant, Calandra, used the term "bo" towards African American men, exclusively.

Defendant's Response:

This fact is in controversy.

Plaintiff's Disputed Fact #14:

Plaintiff asked other African American officers and supervisors if bo and boy were synonymous.  They told him that they were. (Shaw Affidavit 69) .

Defendant's Response:

This fact is in controversy.

Plaintiff's Disputed Fact #15:

Specifically, Sgt Harris told Plaintiff that he interpreted bo to be short for boy and a racial slur towards African Americans. (Affidavit of Harris).

Defendant's Response:

Sgt. Harris submitted an affidavit which speaks for itself.

Plaintiff's Disputed Fact #16:

Calandra, one of Plaintiff training supervisors, who may have believed that Plaintiff was partly of Latino descent, called him Rico Suave after a Latino singer, and asked him if he spoke Spanish. (Shaw Affidavit 70).

Defendant's Response:

These facts are in controversy.



Plaintiff's Disputed Fact #17:

> Calandra also would mimic a voice and accent which he told Shaw was a parody of what he referred to as an uppity black person. (Shaw Affidavit 71).

Defendant's Response:

> These facts are in controversy.

Plaintiff's Disputed Fact #18:

> After being assigned to the Courthouse, Plaintiff was given further training while at the courthouse.  From July 2003 to November 2003, the Plaintiff received seven (7) performance evaluations while he was assigned to Court House Security Detail.  The evaluations reveal the Plaintiff performed his courthouse duties well and in a professional manner.

Defendant's Response:

> The fact that the Plaintiff received 7 evaluations while he was assigned to the courthouse is not in controversy; however, for clarification, not all of the evaluations reflect Plaintiff performed well and professionally. (See Exhibit 3 to Defendant's Memorandum in Support of Summary Judgment.).

Plaintiff's Disputed Fact #19:

> Sgt. Harris, Plaintiff direct supervisor, evaluated the Plaintiff as performing his duties well while at the Courthouse. (Harris Affidavit).

Defendant's Response:

> Sgt. Harris submitted an affidavit which speaks for itself.

Plaintiff's Disputed Fact #20:

> Corporal Fyfe (white officer) was Plaintiff's training supervisor for driving at one point.  In one evaluation written on September 12, 2003, by Cpl. Fyfe, it was noted that the Plaintiff admitted to having night vision problems as a possible reason for his poor driving performance.  This came on the heels of a night driving incident.  Cpl. Fyfe told Plaintiff not to worry because all African Americans had trouble seeing in the dark. (Shaw Affidavit 73).

Defendant's Response:

> These facts are in controversy.



Plaintiff's Disputed Fact #21:

> On November 15, 2003, Capt. Roper released Plaintiff from training and approved him for duty.

Defendant's Response:

> The fact that Captain Roper released Plaintiff from training and approved him for duty is not in controversy; however, for clarification, Plaintiff was released for courthouse security duty, not for road patrol. (See Exhibit 2 to Defendant's Memorandum in Support of Summary Judgment.)

Plaintiff's Disputed Fact #22:

> On March 29, 2004, the Plaintiff was stopped at a traffic light, while on duty in a county vehicle, when he was rear ended by another driver. He sought treatment the same day at Doctor's Care under workers' compensation coverage. Plaintiff went to Doctor's Care one time on March 29, 2004. He was observed and discharged. (Shaw Affidavit 93).

Defendant's Response:

> These facts are not in controversy.

Plaintiff's Disputed Fact #23:

> While on duty at the Courthouse, Shaw met with Lt. Mattox, a new supervisor, in late September, or early October of 2004. Shaw explained his concerns about the race discrimination and harassment he felt he had been subjected to while in his training phases. Lt. Mattox listened to the complaints. (Shaw Affidavit 79).

Defendant's Response:

> These facts are not in controversy.

Plaintiff's Disputed Fact #24:

> In November of 2004, the Plaintiff's pain in his neck and back reestablished. Plaintiff decided he had a more serious injury and mentioned it to Sgt. Wade.

Defendant's Response:

> The fact that the Plaintiff mentioned his back was still hurting from the accident is not in controversy; however, for clarification, Sgt. Wade told



Plaintiff to see a doctor and take care of the injury. The plaintiff did not follow her order to seek medical treatment. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.)

Plaintiff's Disputed Fact #25:

On November 18, 2004, Lt. Mattox and Sgt. Wade spoke to the Plaintiff about his medical problems and told him to contact Jan Watts, the Beaufort County Risk Manager. (Shaw Affidavit 44).

Defendant's Response:

The fact that Lt. Mattox and Sgt. Wade spoke with the Plaintiff about his medical problems is not in controversy; however, for clarification, both Sgt. Wade and Lt. Mattox ordered the plaintiff to see a doctor and take care of the injury and to pursue his workers' compensation claim. The plaintiff did not follow these directives. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

Plaintiff's Disputed Fact #26:

At the November 18, 2004 meeting, Shaw again told Mattox that he felt like he had been treated unfairly during training because of his race, and mentioned being subjected to racist comments by his training supervisors. (Shaw Affidavit 80).

Defendant's Response:

These facts are in controversy.

Plaintiff's Disputed Fact #27:

As instructed, Plaintiff contacted Jan Watts to request that he be evaluated for further treatment. It was at this time that Plaintiff was informed by Jan Watts that his workers' compensation claim had expired and that Plaintiff would have to seek medical treatment and a resolution of his claim through the private sector (pay for his own medical treatment and sue the other driver privately to seek compensation for his medical bills). (Shaw Affidavit 54-46; Exhibit # 2 to Plaintiff response to Summary Judgment, a letter from Jan K. Watts).

Defendant's Response:

The fact that the Plaintiff was told by Jan Watts that his claim had expired is not in controversy; however, for clarification, the plaintiff never followed up



11

on medical treatment and therefore the time to pursue his claim expired. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

Plaintiff's Disputed Fact # 28:

A week or so after his meeting with Lt. Mattox and Sgt. Wade, Plaintiff was working in the courthouse when Sgt. Wade asked Plaintiff to move the file cabinet. He made the attempt, and felt a sharp pain in his back. He said "ouch! I hurt myself!" Sgt. Massey was present, and observed this. Plaintiff notified her that he had hurt his back. He took several Advil and worked out the rest of the day after reporting the incident to Katrina Polite. (Shaw Affidavit 49).

Defendant's Response:

These facts are in controversy because Sgt. Massey was never employed by the Defendant and is an employee of the Port Royal Police Department. In addition, Katrina Polite was never in a supervisory position over the Plaintiff thus any report the Plaintiff made to Katrina Polite of his injury would not be in accordance with the Defendant's chain of command protocol.

Plaintiff's Disputed Fact #29:

On December 9 , about a week one (l) later Sgt. Wade called Plaintiff to her desk, and then told him to never mind she was going to ask him to move the cabinet again, but had decided to ask Sgt. Fanger to handle it instead, as Shaw had reminded her that his back was still hurting. (Shaw Affidavit 51).

Defendant's Response:

These facts are in controversy.

Plaintiff's Disputed Fact #30:

The next day, Sgt. Wade asked Sgt. Fanger to handle moving the cabinet. Shaw was present and ready to help, but Sgt. Fanger told him to wait until they got another officer to help them. While they were waiting, Capt. Roper called them into his office and demanded to know whether Shaw had been asked to move the cabinet, and whether he had refused to do it. Capt. Roper asked several questions about Shaw's medical condition, accused Shaw of never having contacted Watts at all (Wade claims to have been aware, at this point that Shaw did contact Watts and was denied coverage for treatment, although she did not speak up in Shaw's defense). Roper suspended Plaintiff on the spot, but did not punish Fanger. (Shaw Affidavit

12



55-57).

Defendant's Response:

These facts are in controversy.

Plaintiff's Disputed Fact #31:

On December 10, 2004, Lt. Mattox recommended that Shaw be terminated, as did Sgt. Wade, who now claimed that she had ordered Shaw to report to her on what Watts had told him. Wade also claimed that Watts had instructed the Plaintiff to get further medical attention from a private physician in order to be evaluated for workers comp. treatment.

Defendant's Response:

The fact that Lt. Mattox and Sgt. Wade recommended Shaw's termination is not in controversy; however, for clarification both recommendations were for insubordination, failing to get medical attention. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

Plaintiff's Disputed Fact #32:

On December 13, 2004, Lt. Col. David Brown also recommended termination of the Plaintiff. The Plaintiff was terminated on December 13, 2004, allegedly for insubordination.

Defendant's Response:

This fact is not in controversy.

Plaintiff's Disputed Fact #33:

At the time that the Plaintiff was terminated, the insubordination that Defendant claimed Plaintiff had committed was allegedly refusing to follow up with Jan K. Watts or not cooperating with Mr. Watts office in order to get workers compensation treatment for his injuries.

Defendant's Response:

These facts are not in controversy; however, for clarification, Plaintiff was insubordinate in not following through on his worker's compensation claim and medical treatment even though he was still injured from the accident. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).



Plaintiff's Disputed Fact #34:

> After his termination, Plaintiff contacted Mr. Watts, and Mr. Watts wrote Plaintiff a letter, explaining that Mr. Shaw had contacted him when Shaw said he did, that Mr. Watts had told Shaw that there was no workers' compensation coverage, and that Shaw would have to pursue any treatment at his own expense, and, finally, that Mr. Shaw had not failed to comply or cooperate with Mr. Watts' department. This letter is attached as Exhibit #2 to the Plaintiff Response to Summary Judgment.

Defendant's Response:

> These facts are not in controversy; however, for clarification, there was no longer worker compensation coverage because the Plaintiff allowed the claim to expire by not following up with medical treatment needed for his full recovery. (See Exhibit 8 to Defendant's Memorandum in Support of Summary Judgment.).

## STANDARD OF REVIEW

### I.    Summary Judgment

To grant the Defendant's motion for summary judgment, the Court must find that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that



14

party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

(1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving

party bears the burden of proof." <u>Hughes v. Bedsole</u>, 48 F.3d 1376, 1381 (4th Cir. 1995)

(quoting <u>Pachaly v. City of Lynchburg</u>, 897 F.2d 723, 725 (4th Cir. 1990)). Summary

judgment is not "a disfavored procedural shortcut" but an important mechanism for weeding

out "claims and defenses [that] have no factual bases." <u>Celotex</u>, 477 U.S. at 327.

## II.    The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to this Court. The

recommendation has no presumptive weight, and the responsibility for making a final

determination remains with the Court. <u>Mathews v. Weber</u>, 423 U.S. 261, 269 (1976). The

Court reviews *de novo* those portions of the R&R to which a specific objection is made, and

the Court may accept, reject, or modify, in whole or in part, the recommendation of the

Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. 28

U.S.C. § 636(b)(1)(C).

## DISCUSSION

In the 38-page R&R, the Magistrate Judge first addressed the Defendant's assertion

that the Plaintiff failed to timely serve the summons and complaint.[1]  Then, even though

the Magistrate Judge recommended dismissal without prejudice for failure to timely effect

service, the Magistrate Judge also addressed each of the Plaintiff's claims on the merits

---

[1] The Defendant asserted in its answer, amended answer, and memorandum in support of its motion for summary judgment that the Plaintiff's complaint should be dismissed pursuant to Rules 12(b)(5) and/or 12(b)(6) of the Federal Rules of Civil Procedure due to the insufficiency of the service of process and the consequent lack of personal jurisdiction.

15



and concluded that the Defendant was entitled to summary judgment.  The Court will first

address the issue of service.

## I.    Whether the Plaintiff timely and properly effected service of the summons and complaint?

Under Title VII, a claimant must file suit within 90 days after receipt of a right-to-sue

letter from the United States Equal Employment Opportunity Commission ("EEOC").  See

42 U.S.C. § 2000e-5(f)(1).  If suit is not filed within this 90-day period, the claimant forfeits

the right to pursue the claim.  See Baldwin County Welcome Center v. Brown, 466 U.S.

147, 149-50 (1984); Darden v. Cardinal Travel Ctr., 493 F. Supp. 2d 773, 775 (4th Cir.

2007).  Here, the EEOC right-to-sue letter was dated August 31, 2005, and the Plaintiff

timely filed his complaint on November 21, 2005, some 83 days after the date of the right-

to-sue letter.

In addition to timely filing his complaint, however, the Plaintiff also needed to timely

serve the Defendant, the Beaufort County Sheriff's Office, with the summons and

complaint.  The Federal Rules of Civil Procedure provide plaintiffs with "120 days after the

filing of the complaint" to serve defendants with the summons and complaint.  Fed. R. Civ.

P. 4(m).  Rule 4(m) provides:

> If service of the summons and complaint is not made upon a defendant
> within 120 days after the filing of the complaint, the court, upon motion or on
> its own initiative after notice to the plaintiff, shall dismiss the action without
> prejudice as to that defendant or direct that service be effected within a
> specified time; provided that if the plaintiff shows good cause for the failure,
> the court shall extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

Here, the Plaintiff filed his initial complaint on November 21, 2005, but he never

served it on the Defendant.  Then, in March of 2006, the Plaintiff filed an amended

16



complaint and attempted to serve it on the Defendant by mailing a copy of the amended complaint to the Defendant on March 24, 2006, some 123 days after filing the initial complaint. In its answer and its amended answer, the Defendant raised the affirmative defense of failure to timely serve the summons and complaint.

Although the district court has authority to extend the time for service of defendants beyond the 120-day period, this discretionary authority is based upon a plaintiff establishing good cause for the failure to serve defendants. See Anderson v. City of Rock Hill, Slip Copy, 2007 WL 3986035, *2 (D.S.C. April 15, 2005) (citing Mendez v. Elliot, 45 F.3d 75, 79 (4th Cir. 1995)). In Anderson, Judge Currie rejected the plaintiff's stated reasons for his failure to serve the defendants within the 120-day time period. Specifically, Judge Currie determined that the plaintiff's stated reasons (that he was busy pursuing an action in the state court; that he was busy seeking employment; that service through the local sheriff's department was too costly and he therefore endeavored to find addresses for service himself; and that he was proceeding *pro se*) did not meet the standard of good cause. Id. In dismissing the plaintiff's complaint without prejudice, Judge Currie noted that "without prejudice does not mean without consequence," as the plaintiff's statute of limitations period for filing a suit under Title VII had expired, preventing him from refiling and properly effecting service. Id. (quoting Powell v. Starwalt, 866 F.2d 964, 966 (7th Cir. 1989)) (internal quotations omitted).

In the present case, contrary to Anderson, the Plaintiff has not requested that the Court grant him an extension of time to properly effect service; nor has the Plaintiff showed any good cause for his failure. Moreover, the Plaintiff has been on notice since April of 2006 that he failed to timely effect service but has done nothing to correct the error.



In addition to the Plaintiff's failure to timely serve the Defendant, it appears that the Plaintiff failed to properly serve the Defendant. Rule 4(j)(2) of the Federal Rules of Civil Procedure provides:

> Service upon a state, municipal corporation, or other governmental organization subject to suit shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state for the service of summons or other like process upon any such defendant.

Fed. R. Civ. P. 4(j)(2). In South Carolina, sheriffs are state officials, and sheriff's departments are state agencies. See Gulledge v. Smart, 691 F. Supp. 947, 954-55 (D.S.C. 1988); Cone v. Nettles, 308 S.C. 109, 112 (1992); Barnes v. Spartanburg County Sheriff's Office, Slip Copy, 2007 WL 1377564, *6 (D.S.C. May 7, 2007). Rule 4(d)(5) of the South Carolina Rules of Civil Procedure provides that service upon an officer or agency of the state be effected "by delivering a copy of the summons and complaint to such officer or agency and by sending a copy of the summons and complaint by registered or certified mail to the Attorney General at Columbia." S.C. R. Civ. P. 4(d)(5); see also Maybin v. Northside Correctional Center, 891 F.2d 72, 73 (4th Cir. 1989) (emphasizing rule 4(d)(5)'s requirement that service upon an officer or agency of the state be effected by delivering a copy of the summons and complaint to such officer or agency and by sending a copy of the summons and complaint by registered or certified mail to the Attorney General).

Here, the Plaintiff did not "deliver a copy of the summons and complaint" to the sheriff or his clerk, and the Plaintiff did not send a copy by registered or certified mail to the Attorney General. Instead, the Plaintiff simply mailed the summons and complaint to the Defendant via certified mail. This is improper under both the federal and state rules. Furthermore, as previously mentioned, the Plaintiff has been on notice since April of 2006

18



that the summons and complaint were not properly served; yet the Plaintiff has done nothing to correct the error(s).  Based on the foregoing, the Court agrees with the Magistrate Judge's recommendation that the Plaintiff's complaint should be dismissed without prejudice for failure to timely and properly serve the Defendant.

## A.    The Plaintiff's Objections

In his objections, the Plaintiff first objects to the Magistrate Judge's application of rule 4(d)(5) of the South Carolina Rules of Civil Procedure.  The Court finds this objection without merit and finds the Magistrate Judge's application of rule 4(d)(5) to be proper.

Next, the Plaintiff objects to the Magistrate Judge's finding that the Court does not have personal jurisdiction over the Defendant, arguing that the Defendant made a general appearance and waived its right to raise the issue of personal jurisdiction.  The Plaintiff asserts that the Defendant "never raised personal jurisdiction or sufficiency of service in a pre-answer motion to dismiss.  Rule 12 of the Federal Rules of Civil Procedure allows for a Defendant to raise such issues before filing an Answer and engaging in further litigation and requires that it be done that way." (Obj. at 3.)

The Court finds this objection without merit and founded on an incorrect interpretation of the law.  Specifically, contrary to the Plaintiff's assertion, Rule 12 of the Federal Rules of Civil Procedure does **not** require that the Defendant raise the issue of personal jurisdiction or insufficiency of service of process in a pre-answer motion to dismiss.  Rule 12(b) provides:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, **shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made my**



**motion:**

(1) lack of jurisdiction over the subject matter,
(2) lack of jurisdiction over the person,
(3) improper venue,
(4) insufficiency of service of process,
(5) failure to state a claim upon which relief can be granted,
(7) failure to join a party under Rule 19.

A motion making any of these defenses shall be made before pleading if a further pleading is permitted. **No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion.**

Fed. R. Civ. P. 12(b) (emphasis added). Thus, these "seven enumerated defenses may be made by a single preliminary motion or by a responsive pleading, whichever appears more advantageous to the party who wishes to assert the defense ore defenses." 5B Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1347 (3d ed. 2004). Rule 12(h) provides that the defenses of lack of personal jurisdiction, improper venue, insufficiency or process or insufficiency of service of process are waived "if omitted from a motion . . . or if [they are] neither made by motion under this rule nor included in a responsive pleading . . . ." Fed. R. Civ. P. 12(h).

Here, the Defendant raised the affirmative defense of insufficiency of service of process in his answer and his amended answer, specifically asserting that the Plaintiff's complaint should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. The Defendant later filed a "motion for summary judgment," again raising the defense of insufficiency of service of process.[2] The Court finds that the Plaintiff did not

_____

[2] The Court notes that it would have been more correct for the Defendant to title his motion a "motion to dismiss or in the alternative for summary judgment," as his motion expressly includes a section seeking dismissal pursuant to Rules 12(b)(5) and/or (6).



waive the issue of insufficiency of service of process, and thus, the Court finds the Plaintiff's objection to that effect without merit.

Next, the Defendant objects to the Magistrate Judge's failure to address the issue of subject matter jurisdiction.  The Court finds this objection without merit; the Court clearly has subject matter jurisdiction to hear and adjudicate Title VII claims, and the Magistrate Judge did not need to address the issue of subject matter jurisdiction.

Based on the foregoing, the Court agrees with the Magistrate Judge's recommendation that this action should be dismissed without prejudice for failure to timely and properly serve the Defendant.  Nevertheless, in the event that such a dismissal is unwarranted, the Court will consider the merits of the Plaintiff's claims, addressing both the Magistrate Judge's recommendations and the Plaintiff's objections.

## II.     Whether the Defendant is entitled to summary judgment on the Plaintiff's claims?

In addressing the merits of the Plaintiff's claims, the Magistrate Judge first evaluated the Plaintiff's claim that the Defendant engaged in racial harassment and created a racially hostile work environment.  The Magistrate Judge set forth the appropriate standard for addressing this claim and evaluated the Plaintiff's specific factual allegations, ultimately concluding that the Plaintiff's allegations failed to satisfy the requirement that the complained-of conduct was sufficiently pervasive or severe to create an abusive working environment.

The Plaintiff objects to the Magistrate Judge's analysis of his hostile work environment claim, asserting that the Magistrate Judge engaged in piece-meal analysis as opposed to a holistic analysis of the factual allegations.  The Plaintiff asserts that the



alleged facts prevent a pattern of racial harassment and that whether the harassment was sufficiently severe or pervasive is "quintessentially a question of fact."

The Court has thoroughly reviewed the record, including the Magistrate Judge's R&R and the Plaintiff's objections, and finds that the R&R applies the correct principles of law and reflects an appropriate application of the facts to the law. Thus, viewing the facts in the light most favorable to Plaintiff and examining the totality of the circumstances, including: (1) the frequency of the alleged discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating; or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the plaintiff's work performance, see Harris v. Forklift Sys., 510 U.S. 17, 17 (1993), the Court agrees with the Magistrate Judge that the circumstances fall short of the type of severe or pervasive race-based activity necessary to state a hostile work environment claim. The Plaintiff's objection is therefore overruled.

Next, the Magistrate Judge evaluated the Plaintiff's claim that he was subject to racial discrimination in the form of disparate treatment and termination from employment. The Magistrate Judge set forth the appropriate standards for evaluating this cause of action; the Magistrate Judge determined that the Plaintiff met the first and third prongs of the prima facie case of racial discrimination because he is a member of a protected class and because he suffered an adverse employment action when the Defendant terminated his employment. In addition, the Defendant conceded that the Plaintiff met the third prong of the test because he was qualified for the job and his performance was satisfactory.

At this point, the burden shifted to the Defendant to produce legitimate, non-discriminatory reasons for the adverse employment action, which the Defendant did by



demonstrating that the Plaintiff's termination was due to his insubordination and not because of his race. Specifically, the Defendant asserted that the Plaintiff failed to follow three direct orders from his superiors: (1) that he failed to speak to Jan Watts about his worker's compensation claim; (2) that he failed to report back to his supervisors after speaking to Watts; and (3) that he failed to make an appointment to see a doctor. Because the Plaintiff could not demonstrate that the legitimate reasons produced by the Defendant were not its true reasons but were instead a pretext for discrimination, the Magistrate Judge recommended that the Court grant summary judgment on the Plaintiff's second cause of action.

In his objections, the Plaintiff asserts that a genuine issue of material fact exists as to what orders the Plaintiff actually received. The Plaintiff concedes that he was given one order – to go see Jan Watts regarding his worker's compensation claim – and he claims to have done so. With respect to the final two orders, however, the Plaintiff asserts that whether he received these orders is a fact in controversy.

After a review of the record, the Court disagrees with the Plaintiff's characterization of the record and finds the Plaintiff's objection to be without merit. The record shows that the Plaintiff admitted that he did not report to his superiors that he was still experiencing pain, as he was required to do by BCSO's operating procedure. Moreover, in the parties' joint factual brief, the parties admit that Sergeant Wade ordered the Plaintiff to see a doctor immediately. The parties also agree that the Plaintiff told Sergeant Wade that he had not gone to see a doctor because, "I don't like doctors and I am procrastinating." The Court finds that the record as a whole could not lead a rational trier of fact to find for the Plaintiff on this claim, and therefore, disposition by summary judgment is appropriate. The



Plaintiff's objection is overruled.

The Plaintiff next objects that the Magistrate Judge failed to address his claim that Sergeants Colandra and Slupski failed the Plaintiff as a patrol officer because of his race rather than because of his performance. A review of the record reveals that the Plaintiff did not assert this claim in his amended complaint; nevertheless, even if he had done so, the Court finds that the claim is subject to summary dismissal. The Plaintiff admits, by way of the parties' joint factual brief, that the sergeants evaluated the Plaintiff's performance as substandard. Specifically, Calandra noted numerous weaknesses on the part of the Plaintiff, including his slow completion of incident reports, his poor radio procedures, and his driving ability. Following further field training, Slupski noted, *inter alia*, that the Plaintiff's field notes "leave a lot to desire"; that the Plaintiff's knowledge of South Carolina statutes, county codes, and BCSO policies is "far below acceptable standards"; that his radio procedures "as a whole are unsatisfactory"; and that the Plaintiff's "driving ability is far below the expected average member of the general public, let alone a law enforcement officer." Overall, the evidence of record demonstrates that the Defendant had legitimate, nondiscriminatory reasons for failing the Plaintiff as a patrol officer and instead assigning him to the courthouse security detail, and the Plaintiff has not met his burden of establishing that the Defendant's legitimate, nondiscriminatory reasons were merely a pretext for discrimination. The Plaintiff's objection is overruled.

Next, the Magistrate Judge evaluated the Plaintiff's claim that he was wrongfully terminated in retaliation for participating in protected acts of reporting racial discrimination and opposing discrimination. The Magistrate Judge set forth the standard for establishing a prima facie case of retaliation and concluded that the Plaintiff failed to establish a prima

24



facie case. Specifically, the record indicates that the Plaintiff was transferred to courthouse duty at some point in July of 2003, and the Plaintiff testified that shortly after his transfer, he told his supervisor at the courthouse, Mattox, of the alleged discrimination he faced while in training. The Plaintiff was not disciplined and terminated until December of 2004, more than a year after he had been assigned to courthouse duty and allegedly engaged in protected activity. In light of this lapse in time, as well as the circumstances surrounding the Plaintiff's disciplinary action, the Magistrate Judge concluded that the Plaintiff could not show that there was a causal connection between the protected activity and the disciplinary action.

The Plaintiff objects to this conclusion, asserting that there is evidence of a causal connection. Upon review, however, the Court finds the Plaintiff's objection without merit and agrees with the Magistrate Judge that the Plaintiff has failed to set forth facts sufficient to establish a causal connection between the protected activity and the disciplinary action.

Lastly, the Magistrate Judge evaluated the Plaintiff's fourth claim: wrongful termination as a result of pursuing a claim for worker's compensation against BCSO. The Magistrate Judge quoted S.C. Code Ann. § 41-1-80, which provides that "[n]o employer may discharge or demote any employee because the employee has instituted or caused to be instituted, in good faith, any proceeding under the South Carolina Workers' Compensation Law." This section further provides that the "statute of limitations for actions under this section is one year." S.C. Code Ann. § 41-1-80. Here, because the Plaintiff never properly served BCSO with the complaint or the amended complaint, the Magistrate Judge recommended dismissal of this cause of action.

The Defendant objects to the Magistrate Judge's recommendation, reasserting his



objection to the Magistrate Judge's finding that the Plaintiff failed to properly serve the Defendant. As previously addressed in this Order, the Court finds that the Plaintiff failed to properly serve the Defendant and that the complaint is subject to dismissal due to such failure. Moreover, the parties stipulated to the fact that on November 18, 2004, Lieutenant Mark Mattox and Sergeant Wade spoke to the Plaintiff about his medical problems and told him to contact Jan Watts, the Beaufort County Risk Manager, in connection with his worker's compensation claim. After a review of the record, therefore, the Court finds that no genuine issue of material fact exists with respect to the Plaintiff's claim that he would not have been terminated but for his worker's compensation claim. Accordingly, the Court finds the Plaintiff's objection without merit and agrees with the Magistrate Judge's recommendation that the Court should dismiss the Plaintiff's wrongful termination claim under S.C. Code Ann. § 41-1-80.

## CONCLUSION

Based on the foregoing, it is

**ORDERED** that the R&R is adopted and the Defendant's motion for summary judgment is granted.

**IT IS SO ORDERED.**

The Honorable Sol Blatt, Jr.
Senior United States District Judge

September **28**, 2007
Charleston, South Carolina



26